**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| SPACE SYSTEMS/LORAL, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| ORBITAL ATK, INC., | ) | **Jury Trial Demanded** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff Space Systems/Loral, LLC ("SSL"), by counsel, alleges and complains of Defendant Orbital ATK, Inc. ("Orbital ATK") as follows:

## NATURE OF ACTION

1.      Plaintiff SSL is a leading provider of geostationary satellites, space systems, and robotics technology.  Specifically, SSL designs, manufactures, and builds some of the world's most powerful and complex satellites, spacecraft systems, and in-space robotic applications for customers in the commercial, defense, and intelligence industries.

2.      Founded in 1957, SSL has long been a significant innovator in the space systems and space-based robotics arena, investing in and developing cutting-edge technology immediately from its inception.

3.      SSL's reputation as a leader in its field is the result of the company's ability to provide innovative and advanced solutions to meet its customers' mission objectives and needs. Over the past 60 years, SSL and its affiliates have made significant contributions to space exploration and development.  For example, robotic innovations by SSL and its affiliates have

been vital to the construction and maintenance of the International Space Station ("ISS") and to the development and refinement of ISS transport vehicles.

4.      During 60 years of operations, SSL has established a long history with U.S. government space programs, including the National Aeronautics and Space Administration ("NASA").  SSL's work with NASA dates back to the Apollo program, Voyager mission, the first Synchronous Meteorological Satellites ("SMS"), and numerous other science, exploration, and technology development initiatives.

5.      Moreover, SSL and its affiliates have supported NASA on all of the Space Shuttle and ISS robotic systems.  SSL's contributions to robotic space exploration also includes building the robotic arms on all of the Mars rovers and landers.  Currently, SSL is building the spacecraft bus for the newest NASA Discovery Mission, Psyche.

6.      NASA is an important SSL government customer and partner generally, and in the space-based robotics and robotic satellite servicing arena specifically.

7.      NASA conducts its work in four principal organizations that are referred to as "mission directorates."  The relevant mission directorate for this matter is the Space Technology Mission Directorate ("STMD"), which focuses on the development, innovation, and application of revolutionary technologies that enable future NASA missions while also providing economic benefits to the domestic economy.

8.      As explained below, in 2015, NASA STMD announced a solicitation seeking project proposals for public-private partnerships aimed at achieving NASA's goals of expanding capabilities and opportunities in space.  Specifically, through a solicitation titled "Utilizing Public-Private Partnerships to Advance Tipping Point Technologies" (hereinafter "Tipping Point Solicitation"), NASA sought proposals for the development of advanced technologies with the

goal that private industry would, in partnership with NASA, mature such technologies sufficiently that they could be implemented commercially and be utilized by the Agency without further government investment.

9.      In August 2015, SSL submitted a proposal to NASA in response to the Space Technology Mission Directorate's solicitation described above. The proposal, for a project referred to as "Dragonfly," was submitted to NASA. Following a lengthy review and evaluation process, NASA notified SSL in November 2015 that SSL's proposal had been selected.

10.      In June 2016, SSL submitted to NASA's Marshall Space Flight Center ("NASA Marshall") its final proposal and began the process of negotiating terms and conditions with NASA regarding the Dragonfly project. On September 1, 2016, NASA officially awarded SSL a contract for the Dragonfly project.

11.      On December 6, 2016, personnel at NASA Marshall notified SSL that a "data breach had occurred involving proprietary data from SSL residing on a NASA NX server at NASA's Langley Research Center" ("NASA Langley"), which is located in Hampton, Virginia. NASA Marshall further informed SSL that the breach occurred because an employee of another contractor accessed files on NASA's NX server beyond the files the employee was authorized to view.

12.      In the December 6, 2016 communication, NASA Marshall personnel stated that an investigation "is ongoing at Langley in order to assess what was accessed by the contractor's employee and to what extent the employee may have viewed, printed, or copied any of the material as well as the disposition of the material" and promised to keep SSL updated "as soon as possible after details become available."

13.    Through updates from NASA on December 9 and December 14, 2016, SSL learned that the contractor whose employee perpetrated the breach was Orbital ATK, that at least four files containing SSL proprietary data were opened and/or viewed as part of the data breach, and that the files containing SSL's proprietary information had been accessed by as many as six Orbital ATK employees.

14.    NASA stated that its investigation was ongoing and that Orbital ATK was also conducting an internal investigation into the breach.

15.    On December 19, 2016, SSL notified Orbital ATK that it was aware that one or more employees at Orbital ATK had, without authorization, improperly accessed SSL proprietary and confidential information residing on NASA's NX server.

16.    Emphasizing the importance of the matter and that SSL takes very seriously the protection of its confidential and proprietary information, SSL asked Orbital ATK to provide answers to key questions about the scope and impact of the data breach, including but not limited to:

- The number of Orbital ATK employees involved in the breach or breaches;
- The roles and responsibilities of the Orbital ATK employees involved in the breach or breaches;
- How and why the Orbital ATK employees accessed SSL's highly sensitive files;
- What the Orbital ATK employees did with the SSL information they accessed;
- How, why, and to whom SSL's confidential and proprietary information was disseminated;
- Whether Orbital ATK and/or its employees were still in possession of SSL's information; and
- How and when Orbital ATK first became aware of the data breach.

17.    On December 31, 2016, Orbital ATK sent SSL a one-page letter admitting to the unauthorized access of SSL's data.

18.     In its single-paragraph letter, Orbital ATK also conceded that it had terminated "the one employee whose actions violated [Orbital ATK's] ethics policy," but gave no further details about how, why, or when the breach or breaches of NASA's NX server were perpetrated.

19.     Orbital ATK's statement that it had terminated "*the one employee*" was misleading since, eleven days earlier, NASA had informed SSL that as many as *six Orbital ATK employees* had accessed the information.

20.     In its December 31, 2016 letter to SSL, Orbital ATK failed to mention that other employees had accessed the information, perhaps intending to leave SSL with the incorrect impression that dissemination of SSL's confidential and proprietary information was limited to a single employee.

21.     To date, Orbital ATK has not responded to SSL's request for information about the scope, circumstances, and impact of the breach or even confirmed that that the scope of the breach is limited to the four SSL documents previously identified by NASA to SSL.

22.     Orbital ATK has not explained how, when, or why the breach (or breaches) of SSL's data on NASA's NX server were carried out or how Orbital ATK has used the confidential, proprietary, and sensitive information it improperly obtained.  Accordingly, SSL is unable to assess the extent of the damage Orbital ATK's conduct has caused and/or continues to cause and does not know what actions may be necessary to mitigate, if possible, any damage caused to SSL or to prevent future damage to SSL that would be produced by further dissemination and/or use of SSL's confidential, proprietary, and sensitive information.

23.     Devoid of any other resource to protect itself and without sufficient details to assess the extent of the damage caused by Orbital ATK's unauthorized access of the NASA NX server, SSL respectfully seeks the court's intervention to protect its confidential, proprietary, and

sensitive information and to redress the damage caused by Orbital ATK's unauthorized access of NASA's NX server.

24.     As explained above, before filing suit, SSL contacted Orbital ATK to seek information regarding the details and scope of the breach.  Orbital ATK has declined to respond with the exception of a one-page letter which inaccurately suggests that dissemination of SSL's information was limited to a single employee.  Judicial intervention is thus necessary to prevent ongoing damage to SSL via the continued or future use and/or dissemination of SSL's confidential and proprietary data and to protect SSL from unfair and malicious harm and competitive disadvantages resulting from the unauthorized access to SSL's data by its competitor, Orbital ATK.

## PARTIES, JURISDICTION, AND VENUE

25.     Plaintiff SSL is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California.  SSL regularly conducts business throughout the world, including within the Commonwealth of Virginia.

26.     Orbital ATK is a corporation organized under the laws of the State of Delaware with its principal place of business in Dulles, Virginia.  Upon information and belief, Orbital ATK regularly conducts business in this judicial district.

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Counts 1 and 2 arise under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*, respectively.  This Court has supplemental jurisdiction over the remaining causes of action because they are so related to Counts 1 and 2 that they form part of the same case or controversy under Article III of the U.S. Constitution.

28.     This Court has personal jurisdiction over Orbital ATK because Orbital ATK has its principal place of business in and regularly transacts business in this District.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district. NASA Langley, where the breached NX server resides, is located in this judicial district as are NASA personnel believed to be knowledgeable about the details of Orbital ATK's unauthorized access of NASA's NX server.

**Overview of SSL and the Market for Space-Based Robotics and Robotic Satellite Servicing**

30.     SSL is a subsidiary of MacDonald, Dettwiler and Associates, Ltd. ("MDA"). SSL designs and builds satellites and space systems for a wide variety of government and commercial customers. SSL's products include high-powered direct-to-home broadcast satellites, commercial weather satellites, digital audio radio satellites, Earth observation satellites, and spot-beam satellites for data networking applications. SSL was founded in 1957 as Western Development Laboratories, a division of Philco Corporation, which was acquired by Ford Motor Corporation in 1961 and became Ford Aerospace Corporation. In 1990, Loral Corporation acquired Ford Aerospace Corporation from Ford Motor Corporation and the company was renamed Space Systems/Loral, Inc.

31.     In 2012, SSL was acquired by MDA yet remained fully operational in Palo Alto, California with more than 2,300 engineers, technicians, and business and operations personnel conducting over $1 billion of space systems development for domestic and international customers.

32.     The market for U.S. government contracts in aerospace generally, and for robotic satellite servicing specifically, is fiercely competitive, with multiple large, experienced

international corporations vying to secure valuable opportunities to provide highly sophisticated products and critical support services.

33.     Because of the inherently remote and dangerous nature of the space environment, robotic and autonomous systems are a key enabler in many NASA and U.S. Government space systems.  Earth's orbital environment in particular has resulted in a U.S. Government need for the development of robotic servicing systems that can inspect, repair, relocate, refuel, and upgrade satellites in orbit.

34.     For example, NASA's Restore-L robotic servicing mission is planned to launch into low Earth orbit and refuel the Landsat 7 Earth observation satellite.  Without this additional fuel, Landsat 7 would need to be de-orbited.  Restore-L builds upon NASA's legacy of ISS construction and Hubble Space Telescope servicing (during which astronauts and robots cooperatively conducted the servicing missions).  NASA is interested in leveraging robotic assembly for space-based habitats and telescopes that cannot fit within a single rocket fairing.

35.     Additionally, the need for robotic servicing systems is not limited to NASA. Where NASA is interested in using robotics for supporting science and exploration missions, the Department of Defense, for example, requires similar applications to monitor their spacecraft, which are becoming more vulnerable in an increasingly congested, contested, and competitive environment.

36.     In a very complementary fashion to the work NASA is undertaking, the Defense Advanced Research Projects Agency ("DARPA") is developing a robotic servicing capability via the Robotic Servicing of Geosynchronous Satellites ("RSGS") program.

37.     RSGS is intended to respond to a variety of unique national security scenarios, including inspection of potential attacks, investigation and attribution, repair of extremely

valuable and difficult to replace national assets, rapid response across the wide range of military satellites around the geosynchronous arc, and upgrading satellites in response to evolving threats and adversaries.

38. In parallel with the deployment of demonstration and operational satellite servicing missions, NASA and the Department of Defense (through DARPA) are each investing in different yet complementary next-generation space architectures and robotics capabilities.

39. In competing for NASA selection (and in the satellite and robotics marketplace more generally), SSL has, with considerable economic investment, created and developed significant amounts of confidential and proprietary information, including non-public information relating to SSL's technological vision for robotic satellite assembly, repair, and servicing; research and development efforts and strategies; procurement and performance strategies; financial data and business plans; technical data; customer development; and subcontractor and vendor relationships (collectively, "Confidential Information").

40. Such Confidential Information is economically valuable to SSL's competitors and, as described previously, its value extends far beyond the NASA Tipping Point procurement. Access to the Confidential Information gives Orbital ATK (and other SSL competitors) an unfair competitive advantage with respect to future commercial and government procurements for satellites and robotic satellite assembly, repair, and servicing. The bell cannot be unrung— Orbital ATK cannot unlearn the SSL Confidential Information it has now improperly accessed and SSL has no means, absent judicial intervention, of preventing Orbital ATK from incorporating SSL's confidential and proprietary information into Orbital ATK's own strategic plans and competing public and private sector proposals going forward.

41.     SSL has developed policies and practices to maintain the secrecy of its confidential and proprietary information, including, internal policies and procedures regarding the identification and classification of proprietary and confidential information.

42.     To safeguard SSL's own confidential and proprietary data as well as that of customers and other third parties, SSL restricts employees' access to confidential and proprietary information as required by each employee's business needs and requires employees to execute non-disclosure agreements, among other protections.

43.     SSL has invested significantly to acquire and implement multi-faceted and layered data security technology and other protections in order to safeguard its confidential and proprietary data, including, for example:

- Imposing restrictions on remote access to SSL's network;

- Requiring individual password protection;

- Implementing data encryption on SSL computers, servers, and mobile devices; and

- Conducting periodic cybersecurity audits.

44.     Pursuant to its internal policies, the classification "SSL Proprietary" applies to SSL's internal and contractually protected highly sensitive information, where compromise would be substantially and irreversibly detrimental to SSL business interests.  SSL's internal policies regarding the safeguarding of SSL Proprietary Information specifically includes in the definition of "SSL Proprietary Information" all technical information, contract data, satellite designs, robotic systems designs, satellite and robotic performance capabilities, data relating to SSL business operations and administration, trade secrets, data protected by state or federal privacy regulations, proposal data, financial and employee information, intellectual property, and data pertaining to technical developments.

45.     SSL's policies require that documents containing SSL Proprietary Information shall be conspicuously marked with a legend identifying the document as "SSL Proprietary" in accordance with internal operating guidelines for the marking, maintenance, and transmittal of proprietary information.   Documents submitted to the U.S. government are further marked "Competition Sensitive" in addition to bearing "SSL Proprietary" markings.

**NASA's Tipping Point Initiative and Solicitation**

46.     In 2015, NASA's Space Technology Mission Directorate issued the Tipping Point Solicitation.

47.     The Solicitation sought industry-developed space technologies able to foster the development of commercial space capabilities, while also benefitting future NASA missions. NASA has publicly explained that a key aspect of the Tipping Point initiative is to "stimulate the commercial space industry while leveraging those same commercial capabilities through public-private partnerships to deliver technologies and capabilities needed for future NASA, other government agency, and commercial missions."

48.     Thus, in competing for selection by NASA, SSL needed to propose innovative and novel strategies, distinct from its rivals.   Additionally, proposed projects needed to be substantiated with the market demand, prospective customers, and letters of interest by those customers.

49.     For the purpose of the Solicitation, NASA sought commercial space technologies that are at a "tipping point" in their development cycle.   A technology is considered at its "tipping point" if "an investment in a ground development/demonstration or a flight demonstration will result in a significant advancement of the technology's maturation, and a high likelihood for utilization of the technology in a commercial space application, and a significant

11

improvement in the offeror's ability to successfully bring the space technology to market." The Tipping Point Solicitation sought proposals for technologies that enable or provide:

- Robotic, in-space manufacturing and assembly of spacecraft and space structures;
- Low size, weight and power instruments for remote sensing applications;
- Small spacecraft attitude determination and control sensors and actuators; and
- Small spacecraft propulsion systems.

50.     On August 3, 2015, SSL submitted to NASA its initial proposal in response to the Tipping Point Solicitation.  The proposal was aimed at the "robotic, in-space manufacturing and assembly of spacecraft and space structures" focus area of the Tipping Point Technologies solicitation.  SSL's proposed Dragonfly project generally involves the development and phased implementation of technology for in-space construction and maintenance of antennae. According to information received from NASA personnel, a copy of SSL's Dragonfly proposal (originally dated August 3, 2015 and revised in December 2015) is one of several documents that Orbital ATK accessed without authorization.

51.     One of the most fundamental physical factors limiting satellite data capacity is antenna aperture size.  When it comes to antennas, bigger is better.  However, the size of satellite antennas is constrained by the volume of the launch vehicle's fairing (the section of the rocket that contains the satellite).

52.     SSL's proposed technology circumvents the constraints of the rocket fairing by focusing on developing and honing robotic capabilities for orbital assembly, repair, and servicing.

53.     The significance of the cutting-edge technology proposed in SSL's Dragonfly proposal is much larger than a single contract.  The purpose of the proposed technology is to design, develop, and implement groundbreaking changes to government and commercial

satellites by incorporating innovative robotics capable of conducting satellite assembly, repair, and servicing operations. SSL's vision is to revolutionize the satellite industry by leveraging robotics for orbital robotic assembly, repair, and servicing activities, and this vision forms the foundation of the Dragonfly proposal.

54.     Space-based robotics provide critical capabilities that are invaluable to SSL's future corporate development. The sheer magnitude and potential of the technology, implementation, mission benefits, and market advantages explained and outlined in SSL's Dragonfly proposal cannot be overstated. Since the technology has the potential to revolutionize the way in which satellites and robotics are developed, combined, and utilized, a strong incentive existed for SSL's competitor, Orbital ATK, to look for ways to obtain SSL's proposal and plans.

55.     As stated earlier, the competition over U.S. government contracts is fierce. For the past seven years, DARPA has been formulating the development of a robotic servicing capability for satellites in geosynchronous orbit. Orbital and ATK (and subsequently the united Orbital ATK entity) have been aggressively involved in conducting studies and participating in technology phases of DARPA's efforts.

56.     SSL plans to leverage its commercial capabilities, experience, and efficiencies to benefit the U.S. Government and has expended substantial resources to pursue a variety of opportunities with NASA, DARPA, the Department of Defense, and other agencies.

**Orbital ATK Improperly and Unlawfully Accessed SSL's Confidential Information**

57.     Orbital ATK improperly accessed, downloaded, reviewed, and disseminated at least four documents containing SSL's confidential, proprietary, and highly sensitive information.

58.     Two of the documents contain extensive and detailed non-public information regarding the implementation of the Dragonfly project between NASA and SSL.

13

59.    The information contained in the documents includes a working plan outlining: the objective of the Dragonfly project (including details about the contract award to SSL and the potential for future awards to implement subsequent phases of the proposed technology); the technical approach of the Dragonfly project (including details regarding specific key features of the project and plans for a testing campaign); details regarding the organizational structure and management approach for implementing the Dragonfly project between SSL and NASA personnel; detailed system engineering information; specifics regarding the unique design and implementation plans for the technology proposed by SSL; and information regarding product realization and resource requirements.  The documents also lay out assignments, timeframes, and reporting requirements for the many phases and tasks for implementation of the Dragonfly program.

60.    A third document provides a detailed Dragonfly project overview and implementation plan.  This document identifies staffing plans and details the work to be completed and the technology to be implemented in each phase of the Dragonfly program, including technical specifications and project cost allocations.

61.    Moreover, the document includes diagrams and pictures of the technology and hardware to be developed and/or enhanced through the Dragonfly program, thus providing a roadmap to SSL's project plans and proposed technologies.

62.    Each page of the document is clearly marked with SSL's logo and the words "SSL Proprietary."

63.    The fourth document is a copy of SSL's revised Technical, Management and Cost Proposal for the Dragonfly project.  The document is a revised version of the proposal materials that SSL submitted to NASA on August 3, 2015 in response to the Tipping Point Solicitation.

14

64.     This document alone is a treasure trove of information for SSL's competitors as it provides the architecture for the Dragonfly program, including SSL-developed technology and future technology in the highly competitive field of robotic satellite assembly, repair, and servicing.

65.     Consistent with the highly sensitive nature of the information contained in the document, its first page is marked with the SSL logo and the following language:

> *Space Systems/Loral, LLC Proprietary/Competition Sensitive Information. The information (data) contained in all pages of this proposal constitutes a trade secret and/or information that is commercial or financial and confidential or privileged. It is furnished to the Government in confidence with the understanding that it will not, without permission of the Offeror, be used or disclosed other than for evaluation purposes; provided, however, that in the event a contract (or other agreement) is awarded on the basis of this proposal, the Government shall have the right to use and disclose this information (data) to the extent provided in the contract (or other agreement). This restriction does not limit the Government's right to use or disclose this information (data) if obtained from another source without restriction.*

66.     Each subsequent page of the document bears the SSL logo and the following language: *SSL Proprietary – Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.*

67.     The document contains highly sensitive, confidential, and proprietary information related to SSL's overall vision, strategy, and approach for orbital satellite assembly, repair, and servicing; SSL's market interests and business motivations for its participation and co-investment in the Dragonfly program; SSL's commercialization plans for the proposed technology; and forward-looking plans and strategies for space robotics, including how such systems could be used in future applications.

68.     The document also contains highly sensitive, confidential, and proprietary information regarding the potential economic value (to SSL and the industry generally) of the

proposed technology and the technology's capability to have a dramatic impact beyond the confines of the Dragonfly project.

69.     Consistent with the discussion above regarding the common interest of NASA and DARPA in the development and advancement of space-based robotics and robotic satellite servicing, this fourth document improperly accessed by Orbital ATK also discusses SSL's prior business relationship with DARPA and, in particular, DARPA's investment in some of the technology involved in the Dragonfly proposal.

## COUNT ONE
**Computer Fraud and Abuse Act**, 18 U.S.C. § 1030 *et seq.*

70.     SSL incorporates allegations in paragraphs 1–69 as if set forth herein.

71.     Upon information and belief, the NX server at NASA Langley accessed by Orbital ATK and/or its employee to view, download, and/or use SSL's confidential, proprietary, and highly sensitive information (the "protected computer") was used in or affected interstate or foreign commerce.

72.     The protected computer is a high speed data processing device that performs logical, arithmetic, and/or storage functions, and includes a data storage facility and a communications facility directly related to or operating in conjunction with the protected computer.

73.     Orbital ATK, acting through at least one employee, intentionally and without authorization or in excess of authorized access, accessed a protected computer at NASA Langley and thereby obtained information from NASA, an agency of the United States.

74.     Orbital ATK, acting through at least one employee, intentionally and without authorization, accessed the protected computer and obtained information from the protected computer through intentionally viewing, downloading, copying and/or disseminating proprietary

16

and confidential files and trade secrets from the protected computer to separate electronic storage devices and/or computers or servers that are under the possession, custody, or control of Orbital ATK.

75.     Orbital ATK, acting through at least one of its employees, intentionally and without authorization, accessed the protected computer and, as a result, caused damage and loss by impairing the availability, integrity, and confidentiality of SSL's proprietary data and information.

76.     Additionally, due to Orbital ATK's actions, SSL was forced to incur costs in conducting a damage assessment and initiating and engaging in multiple communications with NASA personnel attempting to obtain information and details about the extent, scope, and impact of Orbital ATK's unauthorized access to SSL's confidential, highly sensitive, and proprietary information.

77.     Additionally, SSL expended resources contacting Orbital ATK to seek information and details about the extent, scope, and impact of Orbital ATK's unauthorized access to SSL's confidential, highly sensitive, and proprietary information.  SSL has also expended resources to identify means of coping with the substantial competitive disadvantage created by Orbital ATK's theft.

78.     As a result of Orbital ATK's intentional actions, SSL has sustained aggregate losses that far exceed $5,000 in value during a one-year period.

79.     As a result of Orbital ATK's intentional actions, Orbital ATK, upon information and belief, caused damage by impairing the availability, integrity, and confidentiality of SSL's proprietary data and information located on a NASA protected computer.

80.     The damage caused to the NASA protected computer affected a computer used by or for an entity of the United States Government in, upon information and belief, furtherance of the administration of national defense or national security.

81.     As a result of Orbital ATK's violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, SSL suffered economic damages in an amount to be determined at trial.

## COUNT TWO
**Defend Trade Secrets Act of 2016**, 18 U.S.C. § 1832 *et seq.*

82.     SSL incorporates allegations in paragraphs 1–81 as if set forth herein.

83.     As a result of Orbital ATK's unauthorized access to SSL's information on NASA's NX server, Orbital ATK learned of, was exposed to, had access to, and had an opportunity to acquire Confidential Information owned by SSL, including non-public information relating to SSL's procurement and performance strategies, financial data, business plans, contract staffing procedures, research and development efforts, technical data, customer development, and subcontractor and vendor relationships.  This Confidential Information relates to services used and intended for use in interstate and foreign commerce.

84.     This Confidential Information constitutes trade secrets because it derives independent economic value from not being generally known to persons including SSL's competitors, and because it is not readily ascertainable through proper means.

85.     SSL's business is dependent upon its ability to submit proposals to the U.S. Government, foreign governments, and private sector entities domestically and throughout the world that contain better technology, superior services, innovative development strategies, and more affordable pricing than its competitors.

86.     With knowledge of this Confidential Information, competitors can modify their proposals to undercut any and all of SSL's potential advantages.

87.     Further, as explained above, SSL takes measures to protect the secrecy of this Confidential Information.

88.     Orbital ATK, acting through at least one of its employees, with intent to convert SSL's trade secrets, and in knowing and willful violation of NASA policies and, upon information and belief, in violation of Orbital ATK's contractual and fiduciary duties to NASA not to access information and data belonging to competitors, improperly and without authorization from NASA, accessed SSL's highly sensitive, confidential, and proprietary information, files, documents, and data.  By means of this theft, Orbital ATK engaged in actual misappropriation by, without authorization:

    a.    Accessing SSL confidential, sensitive, and proprietary data and files residing on NASA's NX server system and, upon belief, copying SSL's Confidential Information onto Orbital ATK's own server, system, and/or computers and retaining the data, including at least four documents containing highly sensitive, confidential, and proprietary data related to SSL-developed and designed technology for robotic satellite assembly, repair, and servicing technology related to the Dragonfly program.  SSL cannot determine the full extent of Orbital ATK's theft because neither NASA nor Orbital ATK has confirmed that the breach or breaches by Orbital ATK was in fact limited to the four SSL documents that have been identified to SSL so far;

    b.    Failing to prevent the forwarding, copying, or otherwise disseminating SSL's Confidential Information among and between as many as six Orbital ATK employees; and

19

c.      Upon information and belief, using and disclosing the Confidential Information identified herein for the benefit of Orbital ATK.

89.     The Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate or foreign commerce.

90.     SSL may seek monetary damages to recover its actual loss and the unjust enrichment caused by Orbital ATK's actual and threatened misappropriation.

91.     Orbital ATK's actions were willful and malicious, and taken in support of a broader corporate agenda to prevent SSL from being able effectively to compete against Orbital ATK in the space-based robotics and robotic satellite servicing arena.  SSL seeks exemplary damages and attorneys' fees as appropriate for bad faith or willful and malicious misappropriation.

## COUNT THREE
**Misappropriation of Trade Secrets**, Va. Code Ann. § 59.1-336 *et seq*.

92.     SSL incorporates allegations in paragraphs 1–91 as if set forth herein.

93.     As a result of Orbital ATK's unauthorized access and downloading of SSL's Confidential Information, Orbital ATK learned about, was exposed to, had access to, and had an opportunity to acquire SSL's Confidential Information, including non-public information relating to SSL's technological innovations and strategies to leverage robotics in support of orbital satellite assembly, repairs, and servicing; procurement and performance strategies; financial data and business plans; research and development efforts; technical data; customer development plans; and subcontractor and vendor relationships.

94.     SSL's Confidential Information constitutes trade secrets because it derives independent economic value from not being generally known to or ascertainable through proper

means by SSL's competitors, who could then defeat SSL in proposals for future public and private sector work.

95.     SSL's business depends upon being able to submit proposals to governments and commercial entities which contain better technology, superior services, innovative development strategies, and more affordable pricing than its competitors.

96.     With knowledge of this Confidential Information, competitors can modify their proposals to undermine any and all of SSL's potential advantages.

97.     SSL takes measures to protect the secrecy of its Confidential Information, as explained above.

98.     Orbital ATK, acting through at least one of its employees, with intent to convert SSL's trade secrets, and in knowing and willful violation of NASA policies and, upon information and belief, in violation of Orbital ATK's contractual and fiduciary duties to NASA not to access information and data belonging to competitors, improperly and without authorization accessed SSL's highly sensitive, confidential and proprietary information, files, documents, and data.  By means of this theft, Orbital ATK engaged in actual misappropriation by, without authorization:

      a.     Accessing SSL confidential, sensitive, and proprietary data and files residing on NASA's NX server system and, upon belief, copying SSL's Confidential Information onto Orbital ATK's own server, system and/or computers and retaining the data, including at least four documents containing highly sensitive, confidential, and proprietary data related to SSL-developed and designed technology for robotic satellite assembly, repairs, and servicing.  SSL cannot determine the full extent of Orbital

ATK's theft because neither NASA nor Orbital ATK has confirmed that the breach or breaches by Orbital ATK was in fact limited to the four SSL documents that have been identified to SSL so far;

b.   Failing to prevent the forwarding, copying, or otherwise disseminating SSL's Confidential Information among and between as many as six Orbital ATK employees; and

c.   Upon information and belief, using and disclosing the Confidential Information identified herein for the benefit of Orbital ATK.

99.   Injunctive relief is an appropriate remedy.  Orbital ATK's actions have proximately caused and will continue to cause substantial actual damage to SSL, including financial loss and irreparable harm for which SSL will have no adequate remedy at law.

100.   In the alternative, SSL seeks monetary damages to recover this substantial actual loss and the unjust enrichment caused by misappropriation.

101.   Orbital ATK's actions were willful and malicious and taken in support of a broader corporate agenda to prevent SSL from being able effectively to compete against Orbital ATK in the space-based robotics and robotic satellite servicing arena.  SSL also seeks punitive damages and attorneys' fees as appropriate for bad faith or willful, malicious misappropriation.

### COUNT FOUR
**Virginia Computer Crimes Act,** Va. Code. Ann. § 18.2-152.3 *et seq*.

102.   SSL incorporates allegations in paragraphs 1–101 as if set forth herein.

103.   Orbital ATK intentionally used NASA's NX server system, without authorization or exceeding authorized access, to make or cause to be made an unauthorized copy of information, in violation of Va. Code § 18.2-152.4.

22

104.    Through this conduct, Orbital ATK substantially injured SSL by improperly obtaining SSL's valuable and confidential proprietary information and trade secrets, and using them for purposes not authorized by SSL.

105.    By virtue of Orbital ATK's unauthorized copying of SSL's confidential proprietary information and trade secrets, SSL has suffered damages, including but not limited to investigating the offense, conducting a damage assessment, and developing strategies to cope with the theft.  SSL has and continues to suffer irreparable harm.

## COUNT FIVE
### Conversion

106.    SSL incorporates allegations in paragraphs 1–105 as if set forth herein.

107.    By engaging in the foregoing conduct, Orbital ATK wrongfully appropriated and exercised authority over SSL's Confidential Information.

108.    Orbital ATK's appropriation and assertion of control over SSL's Confidential Information is inconsistent with and in denial of SSL's rights to this property.

109.    Orbital ATK's actions were intentional, without permission or justification, and constitute a conversion of SSL's property.

110.    This wrongful conversion of SSL's property was and continues to be willful, wanton, and in malicious disregard of SSL's rights.  The wrongful conversion was in support of Orbital ATK's general strategy to eliminate and/or hinder SSL from competing in the robotic satellite servicing arena.

111.    Orbital ATK's actions have caused, and unless restrained, will continue to cause, severe, immediate, and irreparable injury, including irreparable damage to SSL, for which SSL has no adequate remedy at law.  Therefore, injunctive relief is appropriate.

## COUNT SIX
### Unjust Enrichment

112.    SSL incorporates allegations in paragraphs 1–111 as if set forth herein.

113.    As a result of Orbital ATK's conduct as set forth above, SSL has suffered a substantial detriment and Orbital ATK has received and appreciated valuable benefits to which it would not otherwise be entitled.

114.    Under the circumstances, Orbital ATK's obtaining and retention of such valuable benefits without payment to SSL is inequitable.

115.    Therefore, as a result of the conduct set forth above, Orbital ATK has been unjustly enriched by the receipt and appreciation of benefits resulting from the unauthorized access and conversion of SSL's Confidential Information.

116.    As a consequence of the conduct, SSL has suffered and will continue to suffer irreparable harm and loss.

### PRAYER FOR RELIEF

WHEREFORE, SSL prays for an award of compensatory, disgorgement, and punitive damages against Orbital ATK, in an amount in excess of $100,000 to be proven at trial, as well as an award of attorneys' fees and expenses.

WHEREFORE, SSL further prays that this Court:

a.    Enter a Preliminary Injunction requiring Orbital ATK to return all SSL Confidential Information in its possession and confirm the scope of dissemination of SSL's Confidential Information;

b.    Enter a Permanent Injunction requiring Orbital ATK to:

- Return all Confidential Information in its possession;

- Confirm that no Confidential Information was used or is being used by Orbital ATK in any way;

- Refrain from using any Confidential Information in Orbital ATK's own strategy plans, technological developments, and/or bid proposals to any

customer or potential customer (commercial or government) going forward; and

- Refrain from any further unauthorized access of SSL confidential, proprietary, and sensitive information.

c.   Grant SSL such other and further relief the Court may deem just and appropriate.

**<u>Demand for Trial by Jury</u>**

Plaintiff SSL hereby requests a trial by jury of all claims stated herein.

Dated: March 22, 2017                    Respectfully submitted,

*/s/ Lindsey R. Vaala*
Michael S. Dry (Va. Bar No. 48243)
Lindsey R. Vaala (Va. Bar No. 77424)
VINSON & ELKINS, LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
(202) 879-8813 (facsimile)
mdry@velaw.com
lvaala@velaw.com

*Attorneys for Plaintiff*
*Space Systems/Loral, LLC*